FILED

08/27/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 13, 2021

## STATE OF TENNESSEE v. KEONTIS DONTRELL CUNNINGHAM

**Appeal from the Circuit Court for Bedford County**
**No. 2019-CR-18995      M. Wyatt Burk, Judge**

_____

### No. M2020-00874-CCA-R3-CD

_____

A Bedford County jury convicted the defendant, Keontis Dontrell Cunningham, of two counts of aggravated assault, and the trial court imposed an effective sentence of five years' incarceration.   On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions and argues the trial court erred in instructing the jury on self-defense.   Following our review of the briefs, the record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Michael Auffinger (at trial and on appeal), Murfreesboro, Tennessee, for the appellant, Keontis Dontrell Cunningham.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

On the evening of August 31, 2018, the defendant, Keontis Dontrell Cunningham, shot and injured the victim, Francisco Carrillo Rojas, during a drug transaction outside of a home in Bedford County, Tennessee.  Prior to the shooting, Lizeth Gonzalez and Mickaja Cannon were in Ms. Gonzalez's white Toyota Camry at the Park Trail Apartments when

the defendant, Zolan Miles, and Malik Lottie approached Ms. Gonzalez's vehicle. Ms. Cannon had previously dated Mr. Lottie and knew the other men. The three men entered the back seat of the vehicle. Mr. Miles sat behind Ms. Gonzalez who was in the driver's seat, Mr. Lottie sat in the middle, and the defendant sat behind Ms. Cannon who was in the passenger's seat. Ms. Cannon "wanted to buy weed," and as the group drove around, she communicated with the victim in order to do so. Ms. Gonzalez testified that the men in the group, including the defendant, knew Ms. Cannon was attempting to purchase marijuana.

The victim testified that he began communicating with Ms. Cannon on Instagram prior to August 31, 2018. Ms. Cannon wanted to purchase marijuana, the victim told her that he "could find it for her," and the two planned to meet near a Kroger in a strip mall in Shelbyville on August 31 for the exchange.

Before meeting Ms. Cannon, the victim went shopping in Murfreesboro with his friends, Savannah Da Costa and Francisco Zambrano. When they returned from Murfreesboro, Ms. Da Costa felt sick, and the group went to Ms. Da Costa's home instead of meeting Ms. Cannon at the strip mall. Because the plans had changed, the victim provided Ms. Cannon with Ms. Da Costa's address in order to complete the drug transaction. After receiving the address, Ms. Gonzalez drove Ms. Cannon, the defendant, Mr. Lottie, and Mr. Miles to Ms. Da Costa's home and pulled into the driveway.

The victim approached Ms. Gonzalez's vehicle holding two paper plates. In between the plates were approximately three ounces of marijuana contained in three separate bags. When he reached the vehicle, the victim handed Ms. Cannon the plates and marijuana through the partially rolled down passenger side window. Ms. Cannon then "reache[d] back" into the back seat and did not have the plates when she turned back towards the victim. The victim did not realize the men were in the back seat at that time. The victim then saw the brake lights of Ms. Gonzalez's vehicle "going on and off" and stated, "give me my money." When Ms. Cannon failed to provide payment, the victim tried to open the back passenger's side door in order to "get [his] marijuana back." In doing so, the victim began struggling with the defendant to open the door. When the door eventually opened, the defendant fired two shots at the victim. Ms. Gonzalez then backed out of the driveway, and the group fled the scene. The victim testified he did not reach inside the vehicle and did not see a firearm or who shot him. He also admitted that he was "high and tired" at the time of the shooting and as a result, could not recall every detail.

Ms. Gonzalez provided additional but similar details surrounding the shooting. After she pulled into Ms. Da Costa's driveway, the victim approached her vehicle and handed two paper plates and marijuana to Ms. Cannon through the window. Ms. Cannon placed the marijuana and plates in the back of the vehicle and told Ms. Gonzalez "to pull off." The victim saw that "something was going on" and opened the back passenger door.

Approximately two to three seconds later, Ms. Gonzalez "heard the shot go off" from the back seat. She did not see a struggle before the shooting and noted that the victim did not reach inside the vehicle or grab the defendant. Ms. Gonzalez "went into complete shock," her "body was shaking," and she drove away. Approximately one to two minutes later, the defendant, Mr. Lottie, and Mr. Miles exited her vehicle, and Ms. Cannon asked Ms. Gonzalez to take her home.

Ms. Da Costa also testified and identified her home in a photograph. After hearing "[m]ore than one" gunshot, Ms. Da Costa went outside and saw the victim "in [her] neighbor's yard across the street." The victim was holding the left side of his body and his hand was bloody. Ms. Da Costa stayed with the victim until Clarence Santini, a paramedic with Bedford County EMS, responded to the scene. Mr. Santini saw an entrance wound to the left upper quadrant of the victim's torso which was not "bleeding a whole lot." He did not observe an exit wound and believed the victim "was losing a lot of blood on the inside." Mr. Santini transported the victim from the scene and "called for air medical" to transport the victim to Vanderbilt University Medical Center, where the victim underwent emergency surgery. As a result of the surgery, a portion of the victim's colon was removed, and the victim remained in the hospital for two and a half weeks. The victim had a colostomy bag for approximately six months, and he required a subsequent surgery before the bag was no longer needed.

Numerous officers from the Shelbyville Police Department ("SPD") responded to the scene of the shooting and participated in the following investigation. Officer David Dye was the first officer to respond to the scene at approximately 10:45 p.m. Officer Dye saw the victim across the street from the home where the shooting occurred. The victim was "sweating profusely," "screaming in pain," and had "a gunshot wound to the torso." Officer Dye helped secure the scene and learned the suspect vehicle, a white Toyota, fled prior to his arrival. Officer Dye provided a description of the vehicle "over the air," noting "there would be two black males and a Hispanic female and a white female in the vehicle." Officers located a nine millimeter shell casing in the driveway of Ms. Da Costa's home. The shell casing and photographs of the same were entered into evidence along with photographs of the home.

While en route to the scene of the shooting, Lieutenant Charles Merlo received a dispatch providing "that the shooters were possibly in a small, white four-door Toyota vehicle sedan-type car."[1] Lieutenant Merlo observed a vehicle matching the description approximately five or six blocks from the scene of the shooting and advised dispatch of the direction of travel of the vehicle. After receiving the dispatch, Detective Nathan Everhart

---

[1] At the time of the shooting, Lieutenant Merlo served as a sergeant with the Shelbyville Police Department.

and Lieutenant Fred Harvey spotted and initiated a traffic stop of the suspect vehicle, which was Ms. Gonzalez's vehicle. During the stop, Ms. Gonzalez consented to a search of her vehicle, and Detective Everhart observed a spent shell casing on the floorboard of the back passenger's seat. Photographs of the vehicle were entered into evidence, including one showing the spent shell casing. The spent shell casing was also entered into evidence. Detective Everhart did not observe a firearm, paper plates, or marijuana in the vehicle. However, when Ms. Gonzalez and Ms. Cannon exited the vehicle, Detective Everhart smelled "pretty strong raw marijuana." During the stop, Ms. Gonzalez and Ms. Cannon were separated. They were then taken to the police station to be interviewed, and Ms. Gonzalez's vehicle was towed for further processing.

Detective Cody Swift and Lieutenant Merlo interviewed Ms. Gonzalez and Ms. Cannon. During her interview, Ms. Gonzalez identified the men involved as "K.C.," "Trouble," and Mr. Lottie. She stated K.C. was the shooter and provided a picture of the men from a social media account. After learning K.C. and Trouble were from Murfreesboro, Detective Swift provided the picture to the Murfreesboro Police Department who identified K.C. as the defendant and Trouble as Mr. Miles. During the interview, Ms. Gonzalez also consented to a forensic examination of her cell phone. Lieutenant Merlo[2] conducted the examination which revealed that Mr. Lottie called Ms. Gonzalez seven times in the fifteen minutes after the shooting, and Ms. Gonzalez acknowledged the same.

Detective Swift also interviewed Ms. Cannon and Mr. Lottie, both of whom were juveniles at the time and whose mothers participated in the interviews. Before her mother terminated the interview, Ms. Cannon admitted she was in Ms. Gonzalez's vehicle prior to the shooting. Detective Swift stated Mr. Lottie was not cooperative during his interview but did admit to knowing the defendant and Mr. Miles.

On September 4, 2018, Detective Swift interviewed the victim in the ICU at Vanderbilt University Medical Center. The victim "was still very out of it and in pain," but he was able to maintain a conversation with Detective Swift and provided information similar to his trial testimony.

As a result of the investigation, Detective Swift obtained an arrest warrant for the defendant which was executed on September 5, 2018, by the Murfreesboro Police Department. Officers arrested the defendant at Mr. Lottie's mother's apartment. The defendant's room was searched upon his arrest in an effort to locate the firearm used during the shooting. Officers, however, were unable to locate the firearm.

---

[2] Lieutenant Merlo testified he was trained in cell phone forensics and certified in the use of the Cellebrite software used during the examination of Ms. Gonzalez's cell phone.

After his arrest, the defendant was transported to Shelbyville Police Department where he participated in a recorded interview with Detective Swift and Lieutenant Merlo. During the interview, the defendant admitted to riding in Ms. Gonzalez's vehicle to Ms. Da Costa's home in order to obtain marijuana but refused to acknowledge that other people were in the vehicle at the time of the shooting. The defendant described the amount of marijuana as "a Q-P," or a quarter pound, which is approximately four ounces. The defendant also admitted to having a firearm and shooting the victim from the back seat of the vehicle. The defendant, however, blamed the victim for the shooting, claiming the victim opened the door of Ms. Gonzalez's vehicle, attempted to pull him out of the vehicle, and grabbed his gun. The defendant also stated that after the shooting, he was dropped off near his vehicle which was parked at the Park Trail Apartments. According to Detective Swift, the defendant's claims were not corroborated by any other witness during the investigation. The State entered the recorded interview into evidence and played it for the jury.

After the State rested its case-in-chief, the defendant testified on his own behalf. Prior to the shooting, the defendant rode around in Ms. Gonzalez's vehicle with Ms. Cannon, Mr. Lottie, and Mr. Miles. Ms. Gonzalez and Ms. Cannon "said that they wanted to smoke," and Ms. Gonzalez drove the group to Ms. Da Costa's home. At the time, however, the defendant did not know whose home it was or why they pulled into the driveway.

The victim waved Ms. Gonzalez into the driveway and went back inside. About four minutes later, the victim came outside holding "two paper plates and bags of weed inside the paper plates." The defendant realized marijuana was in between the paper plates when the victim approached the front passenger's window of the vehicle. The victim handed Ms. Cannon the paper plates and told her, "I got everything you want." The victim then smiled and looked in the back seat at the men, and Ms. Cannon placed the paper plates on the center console. According to the defendant, the victim and Ms. Gonzalez both "started looking funny." Ms. Cannon then "said something to [Ms. Gonzalez] and then [the victim] comes running to the back seat" and tried to open the door. The victim and the defendant struggled over the door. Once opened, the victim "grabbed" the defendant and "had [him] out [of] the vehicle halfway at one point in time."

During this struggle, the defendant reached for his gun, and the victim "reached for it too." The defendant kept the gun in his right pocket with the handle protruding from the pocket. The defendant stated the victim reached for the gun first:

> When [the victim] reached for it, that's when I pulled it out and I pulled it out and I shot one time and then he came right back and when he came right back, I shot him and that's when he fell and I was just looking at

him while the car was moving because when he started to fall he was falling backwards with the door and then the door slick hit him and that's when he fell and I was like, dang, and then I closed the door.

The defendant admitted to firing two shots approximately three seconds apart from one another with only one shot hitting the victim. The defendant described his thoughts during the shooting, as follows:

Well, at the moment that was a big dude, you know, so I'm thinking, like, I'm thinking a lot of things. I really wanted to get out, if you feel me, and fight him because I didn't know why he was pulling on me, you feel me, but I couldn't get out because the car was moving. And another thing, I didn't want to shoot him but that's the only thing that my mind could conclude to instead of me getting hurt, he got to get hurt.

After the shooting, Ms. Gonzalez drove away and dropped the men off at the defendant's vehicle which was parked on a dead-end street. The defendant did not know what happened to the marijuana, stating no one took it to his vehicle. In response to whether he could smell marijuana in his vehicle, the defendant stated, "No sir. We already had marijuana on us." He also stated that he had money with him on August 31, 2018, but he did not intend to buy marijuana because he "already had some" nor did he intend to rob anyone.

During cross-examination, the defendant stated that the testimony he provided during trial was similar to the information he provided during his police interview, noting, however, that he was "just telling a little more" during trial. For example, the defendant admitted he did not mention that he parked his car on a dead-end street during the interview and could not recall if he stated that the group went to the strip mall in separate vehicles. He did not recall if he told police during the interview that he knew the group went to Ms. Da Costa's home to purchase marijuana; whereas during his trial testimony, the defendant stated he did not know the purpose of the trip. To that end, the defendant admitted that everyone in Ms. Gonzalez's vehicle wanted to smoke marijuana and get high and that he, Mr. Lottie, and Mr. Miles already had marijuana prior to the shooting. The defendant stated he kept marijuana in his left pocket and a gun in his right pocket.

The defendant testified that during the interview he agreed with the police statement that Ms. Cannon moved the marijuana to the back seat of the vehicle after the victim handed it to her, but during trial, the defendant maintained that the marijuana remained on the center console. The defendant further stated, "I never touched the marijuana."

The defendant provided additional and conflicting details concerning the "struggle" which led to the shooting. Regarding his failure to describe the struggle over the door during the police interview, the defendant stated, "I don't think it even came across my mind to tell them that," and acknowledged he did not tell police that he told the victim to "get off of me." The defendant maintained that he told police during the interview that the victim tried to pull him out of the vehicle but admitted he did not tell the police that Mr. Lottie and Mr. Miles tried to pull him back in the vehicle because he "didn't even tell them that it was other boys in the car anyway." The defendant further explained that as the victim was pulling him out of the vehicle, the victim touched his leg, and the defendant "felt [the victim] touch my gun." The defendant stated that one of the victim's hands grabbed his right arm and the other grabbed his right front pocket though he did not recall if he provided this information during the interview. The defendant freed his arm from the victim when the car began moving, and "[w]hen I pulled my gun out, he did not have his hand on my gun." The defendant stated that he "always ke[pt] a bullet in the chamber" of his gun and that he fired a warning shot at the victim who was partially in the vehicle. The defendant thought the victim's hands were on the defendant's hair when the defendant fired the warning shot. Regarding the warning shot, the defendant stated, "I didn't want to hurt him. I ain't never shot nobody." However, because the victim "kept coming" and "grabbed [the defendant] again," the defendant placed the gun "[c]lose to [the victim's] ribs" and fired a second shot. The victim then "stumbled and fell back with the door because the car was in reverse." The defendant admitted that he did not disclose the whereabouts of the gun during the interview, noting "I didn't want them to come get the gun." Ultimately, the defendant admitted to shooting the victim and causing him serious bodily injury.

As noted, the defendant admitted that his trial testimony contained more information than what he provided during his police interview. The defendant explained that during the interview, when confronted with portions of his story that did not align with the investigation, the defendant still did not provide all of the details of what happened "[b]ecause I still had to make my mind up if I wanted to tell them the truth or not." The defendant ultimately admitted to lying during the interview but noted he was not under oath during the same and maintained that his trial testimony was truthful.

After its deliberations, the jury convicted the defendant of aggravated assault in counts 1 and 2. Before merging the convictions, the trial court sentenced the defendant to five years' incarceration for each conviction. The defendant filed a motion for a new trial which was denied by the trial court. This timely appeal followed.

***Analysis***

I.    *Sufficiency of the Evidence*

- 7 -

The defendant contends the evidence is insufficient to support his convictions for aggravated assault. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the

inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant was convicted of two counts of aggravated assault under Tennessee Code Annotated section 39-13-102, which provides that a person commits aggravated assault by intentionally, knowingly, or recklessly committing an assault that results in serious bodily injury to another or by intentionally or knowingly committing an assault through the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i), (iii). A person commits assault by intentionally, knowingly, or recklessly causing bodily injury to another or by intentionally or knowingly causing another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(1), (2).

The defendant argues that despite putting forth multiple witnesses, the State's case "rested solely" on the victim's testimony which contained numerous discrepancies, including the victim's admission "that he was the one who opened the vehicle door" and "that he was under the influence the night in question." As a result, the defendant asserts "the case at bar is plagued with contradictions and inconsistencies so voluminous that reversal is necessary." We, however, disagree as the record makes clear the defendant shot the victim during a drug exchange, resulting in serious bodily injury to the victim.

Viewing the evidence in a light most favorable to the State, the record indicates the defendant, Mr. Lottie, Mr. Miles, Ms. Cannon and Ms. Gonzalez were driving in Ms. Gonzalez's vehicle on August 31, 2018. Ms. Cannon contacted the victim in an effort to obtain marijuana, and Ms. Gonzalez drove the group to Ms. Da Costa's home in order to complete the transaction. Ms. Gonzalez pulled into the driveway, and the victim came outside and handed Ms. Cannon marijuana in between two paper plates. Ms. Cannon placed the marijuana in the back seat of the vehicle and attempted to leave without paying for the drugs. When the victim realized Ms. Cannon did not intend to pay, he attempted to retrieve the marijuana from the back of the vehicle. The victim tried to open the back passenger door, where the defendant was seated, while the defendant attempted to keep the door closed. When the victim opened the door, the defendant pulled a gun from his pocket and fired two shots at the victim before Ms. Gonzalez drove away.

During the pending investigation and at trial, Ms. Gonzalez identified the defendant as the shooter, the defendant admitted to shooting the victim, and officers located a spent shell casing in Ms. Da Costa's driveway and on the floorboard of Ms. Gonzalez's vehicle. As a result of the shooting, the victim underwent emergency surgery to remove a portion

of his colon, remained in the hospital for two and a half weeks, used a colostomy bag for approximately six months, and underwent a second surgery to remove the colostomy bag.

The defendant's argument on appeal does not address the sufficiency of the evidence but speaks instead to the victim's credibility. As noted *supra*, it is the role of the jury to resolve issues of credibility. In reaching its verdict, the jury chose to accredit the victim's testimony over the defendant's and resolved all conflicts in favor of the State. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, the evidence is sufficient to support the jury's verdicts for aggravated assault as the defendant admitted to using a gun to shoot the victim in the torso, and the victim suffered serious bodily injury as a result. The defendant is not entitled to relief on this issue.

## II.    *Self-defense Jury Instructions*

The defendant asserts the trial court erred in instructing the jury on self-defense. While the defendant's precise challenge to the self-defense instruction is unclear, it seems the defendant takes issue with the trial court's inclusion of the castle doctrine. Within this challenge, the defendant contends the trial court erred in finding he was engaged in unlawful activity and in omitting the portion of the self-defense instruction stating the defendant had no duty to retreat. The defendant suggests "there was never any direct proof presented that the [defendant] was involved or was otherwise a participant in the marijuana transaction" and "[t]here certainly was not any proof that the [defendant] was a co-conspirator in the plot to steal the marijuana from the victim." The State asserts the defendant's arguments are waived because they were not "squarely raised" in the motion for a new trial. However, in the motion for a new trial, the defendant generally argued that "[t]he trial court failed to properly instruct the jury on the issue of self-defense" and referenced the two questions posed by the jury during its deliberations regarding the defendant's alleged unlawful activity. Though we find the defendant's appellate arguments unclear, we choose to review his challenge to the jury instruction on the merits.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986) ). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction

to the jury, this Court 'must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (internal quotations omitted)). Questions concerning the propriety of jury instructions are reviewed de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

As relevant to this case, Tennessee Code Annotated section 39-11-611(b)(1)-(2) provides that:

> (1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611 (2020).

In *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), our supreme court clarified that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat" rather than a complete bar to self-defense. *Id.* at 401. "[A] duty to retreat does not mean that a person cannot defend herself or himself." *Id.* at 404. Consistent with the common law duty to retreat, a defendant engaged in unlawful activity "'must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force. *Id.* (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)). The trial court must make a threshold determination of whether a defendant was "engaged in unlawful activity" as part of its decision whether to charge the jury with the no duty to retreat. *Id.* at 403.

Here, the trial court found the defendant was engaged in unlawful activity at the time of the shooting before removing the "no duty to retreat" language from the self-defense jury instruction. In reaching this finding, the trial court stated, "the [c]ourt in its

- 11 -

anticipated jury instructions believes and certainly finds by clear and convincing evidence the State has proven through multiple witnesses that an unlawful activity of the purchase and sale and delivery of marijuana was occurring during the commission of this alleged crime." Therefore, the trial court removed the language in the self-defense instruction stating the defendant did not have a duty to retreat before using force.

In reviewing the record, we conclude the trial court correctly instructed the jury on this portion of the self-defense instruction. It is undisputed Ms. Gonzalez drove to Ms. Da Costa's home in order for Ms. Cannon to purchase marijuana from the victim. Ms. Gonzalez testified that everyone in her vehicle, including the defendant, knew the group was going to Ms. Da Costa's home in order to obtain marijuana, and the defendant admitted the group planned to smoke marijuana that evening. At the home, the victim handed Ms. Cannon approximately three ounces of marijuana, and Ms. Cannon placed the drugs in the back seat of Ms. Gonzalez's vehicle, where the defendant was seated. Based upon this evidence, the trial court made a threshold determination that clear and convincing evidence existed to show that the defendant was engaged in unlawful activity at the time of the shooting. As a result, the trial court excluded the "no duty to retreat" language from the self-defense jury instruction, and nothing in the record supports the defendant's argument that the trial court's instruction on self-defense was erroneous for that reason. Rather, the record makes clear the trial court provided a correct and complete charge of the law regarding self-defense as clear and convincing evidence exists to support the trial court's finding that the defendant was engaged in unlawful activity at the time of the shooting, and as such, the trial court correctly omitted the "no duty to retreat" language from the first portion of the jury instruction on self-defense.

We turn now to the trial court's inclusion of the castle doctrine in its instruction to the jury on self-defense. The record indicates the trial court included the castle doctrine "out of an abundance of caution." In doing so, the trial court instructed the jury, as follows:

A defendant using force intended or likely to cause death or serious bodily injury within a vehicle is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest when that force is used against another person who unlawfully and forcibly enters or has unlawfully and forcibly entered the vehicle, and the defendant using defensive force knew or had reason to believe that an unlawful and forcible entry occurred. This presumption shall not apply if:

(1) the defendant was engaged in unlawful activity, or was using the occupied vehicle to further an unlawful activity

- 12 -

Thus, after making the threshold determination that the defendant was engaged in unlawful activity and removing the "no duty to retreat" language from the first portion of the self-defense instruction, the trial court included the castle doctrine in its instruction which states that the presumption shall not apply if the defendant was engaged in unlawful activity. Relying upon our foregoing analysis, we conclude the trial court erred by including the castle doctrine in its self-defense instruction.

Errors in jury instructions are subject to a "harmless error" analysis. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013) (citing *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998)). The test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)).

As explained above, the trial court made the threshold determination that the defendant was engaged in unlawful activity at the time of the shooting. As a result, the presumption outlined in the castle doctrine did not apply to the defendant, and the trial court erred by including the castle doctrine in the self-defense instruction. However, the record indicates the error was harmless as evidence of the defendant's guilt was overwhelming. The defendant admitted to shooting the victim and testified that he did so in self-defense. The State presented ample proof to refute the defendant's self-defense claim as both the victim and Ms. Gonzalez testified that the victim did not reach inside the vehicle or provoke the defendant before the shooting. The jury clearly accredited the State's proof in reaching its verdict. Accordingly, we conclude the trial court's inclusion of the castle doctrine in the instruction on self-defense had no impact on the jury's verdict but rather provided the defendant with the benefit of a second review of his claim of self-defense. As such, the error was harmless beyond a reasonable doubt, and the defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE

- 13 -